UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CITY OF STERLING HEIGHTS GENERAL
EMPLOYEES' RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated,

                       Plaintiff,

     vs.

CITIGROUP INC., MICHAEL L. CORBAT,
JOHN C. GERSPACH and MARK A.L.
MASON,

                       Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:20-cv-9573

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff City of Sterling Heights General Employees' Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Citigroup Inc. ("Citigroup" or the "Company"), as well as media and analyst reports about the Company and Company press releases and conference call transcripts.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Citigroup common stock between January 15, 2016 and October 12, 2020, inclusive (the "Class Period"), against Citigroup, Michael L. Corbat, Mark A.L. Mason, and John C. Gerspach, seeking remedies for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted arise under §§10(b) and 20(a) of the Exchange Act [15 U.S.C.§§78j(b) and 78t(a)] and Rule 10b-5 [17 C.F.R. §240.10b-5].  Jurisdiction is conferred by §27 of the Exchange Act.  Venue is proper pursuant to §27 of the Exchange Act.  Citigroup's headquarters are located in New York, New York, and many of the acts giving rise to the violations complained of herein occurred in this District.

## PARTIES

3.      Plaintiff City of Sterling Heights General Employees' Retirement System purchased Citigroup common stock, as set forth in the attached certification incorporated herein by reference, and was damaged thereby.

4.      Defendant Citigroup is headquartered in New York, New York.  Citigroup describes itself as a global diversified financial services holding company whose businesses provide consumers, corporations, governments and institutions with a broad range of financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, trade and securities services, and wealth management.  Citigroup has approximately 200 million customer accounts and does business in more than 160 countries and jurisdictions.  The Company currently operates via two primary business segments: Global Consumer Banking and Institutional Clients Group, with the remaining operations in Corporate/Other.  Citigroup trades on the NYSE under the ticker symbol "C."

5.      Defendant Michael L. Corbat ("Corbat") serves as the Company's Chief Executive Officer and a member of the Board of Directors.  On September 10, 2020, it was announced that defendant Corbat would be retiring from his positions in February 2021.

6.      John C. Gerspach ("Gerspach") served as Citigroup's Chief Financial Officer ("CFO").  He left that position on February 22, 2019.

7.      Defendant Mark A.L. Mason ("Mason") has served as Citigroup's CFO since February 23, 2019.

8.      Defendants Corbat, Gerspach and Mason are collectively referred to herein as the "Individual Defendants."

9.      As officers and/or directors and controlling persons of a publicly held company whose common stock is traded on the NYSE and governed by the provisions of the federal

securities laws, defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

10.     Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom and of their materially false and misleading nature.  Because of their executive and managerial positions and/or Board membership with Citigroup, defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Citigroup and its business or adopted by the Company materially false and misleading.

11.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the Class Period.  Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, defendants are responsible for

the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

12.     The Company and the Individual Defendants, by disseminating materially false and misleading statements and/or concealing material adverse facts, are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Citigroup common stock.  The scheme: (i) deceived the investing public regarding Citigroup's business, operations and management and the intrinsic value of Citigroup common stock; and (ii) caused plaintiff and other members of the Class (as defined herein) to purchase Citigroup common stock at artificially inflated prices.

**SUBSTANTIVE ALLEGATIONS**

**Citigroup's History of Regulatory Settlements**

13.     Citigroup has a long history of regulatory violations and settlements relating to its banking and trading practices.  These settlements, which are usually memorialized in consent orders with regulatory authorities, have, in general, required that Citigroup and its subsidiary banks improve their compliance, risk management, internal controls and due diligence. Throughout the Class Period, Citigroup and its executive officers repeatedly reassured investors that Citigroup was fulfilling its obligations under the applicable consent orders and had revamped its risk management and internal control systems sufficiently to comply with these obligations, as well as with the applicable rules and regulations governing Citigroup's business and operations.

14.     2012 Consent Order (Citibank BSA/AML Settlement with OCC):  In 2012, Citibank N.A. ("Citibank"), a banking subsidiary of Citigroup, entered into a consent order with the Office of the Comptroller of the Currency ("OCC") relating to violations of anti-money laundering ("AML") regulations and inadequate internal controls and risk management (the

"2012 Consent Order").  The 2012 Consent Order required, among other things, that Citibank

form a compliance committee, clarify lines of responsibility for compliance, and adopt new due

diligence programs.  The 2012 Consent Order stated, in pertinent part, as follows:

> *The Bank has begun corrective action, and has committed to taking all necessary and appropriate steps to remedy the deficiencies identified by the OCC, and to enhance the Bank's BSA/AML compliance program.*

> \*       \*       \*

> *The Bank has failed to adopt and implement a compliance program that adequately covers the required BSA/AML program elements due to an inadequate system of internal controls and ineffective independent testing.*  The Bank did not develop adequate due diligence on foreign correspondent bank customers and failed to file Suspicious Activity Reports ("SARs") related to its remote deposit capture/international cash letter instrument activity in a timely manner.[1]

15.     <u>2013 Consent Order (Citigroup BSA/AML Settlement with Federal Reserve)</u>:  On

March 21, 2013, defendant Citigroup entered into a separate consent order with the Federal

Reserve based upon the same conduct at issue in the 2012 Consent Order (the "2013 Consent

Order").  The 2013 Consent Order required Citigroup to comply enterprise-wide across all its

various subsidiary institutions with the Bank Secrecy Act ("BSA") and AML provisions.  The

2013 Consent Order represented that Citigroup had already put in place adequate firm-wide risk

management and compliance controls, stating in relevant part as follows:

> WHEREAS, C*itigroup has adopted a firmwide compliance risk management program designed to identify and manage compliance risks across the consolidated organization related to compliance with all applicable laws, rules, and regulations*;

> \*       \*       \*

> The board of directors of Citigroup shall take appropriate steps to fully utilize Citigroup's financial and managerial resources . . . to serve as a source of strength

---

[1]     Emphasis has been added unless otherwise noted.

to each of the Banks, including, but not limited to, taking steps *to ensure that each of the Banks complies with the Consent Orders* . . . .

16.     2014 Consent Order (Citibank FX Settlement with OCC):   On November 11, 2014, Citibank was fined by the OCC and entered into a consent order as a result of its unsafe and unsound practices related to the Company's foreign exchange ("FX") trading businesses (the "2014 Consent Order").   According to the 2014 consent order, Citibank lacked the necessary internal controls, governance and compliance policies and procedures to identify and prevent employee misconduct related to FX sales and trading, but represented that it was committed to addressing these control failures, stating in relevant part as follows:

> The OCC's examination findings establish that the Bank had *deficiencies in its internal controls and had engaged in unsafe or unsound banking practices* with respect to the oversight and governance of the Bank's FX Trading . . . .
>
> *              *              *
>
> *The Bank has committed to, and has already begun, taking necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC*.

17.     2015 Consent Order (Citigroup FX Settlement with Federal Reserve):   On May 20, 2015, defendant Citigroup entered into a separate consent order with the Federal Reserve (the "2015 Consent Order") based on the same FX market misconduct at issue in the 2014 Consent Order.   The 2015 Consent Order found that the Company lacked firm-wide risk governance, risk management and compliance policies and procedures to ensure safe and sound banking practices. Citigroup agreed to implement the necessary process and programs firm-wide to remediate the control failures, stating in pertinent part as follows:

> *Citigroup lacked adequate firm-wide governance, risk management, compliance and audit policies and procedures* to ensure that the firm's Covered FX Activities conducted at the Bank complied with safe and sound banking practices, applicable U.S. laws and regulations, including policies and procedures to prevent potential violations of the U.S. commodities, antitrust and criminal fraud laws, and applicable internal policies;

- 6 -

\*       \*       \*

[T]o address the deficiencies described above, ***Citigroup has made and must continue to implement additional improvements in its oversight, internal controls, compliance, risk management and audit programs*** for Designated Market Activities in order to comply with Citigroup policies, safe and sound banking practices, and applicable U.S. laws and regulations . . . .

**Citigroup Falsely Assured Investors That It
Was Committed to Improving Compliance**

18.    Following these regulatory actions, defendants falsely reassured investors that Citigroup was in full compliance with its obligations under the consent orders detailed above. Defendants claimed to have placed paramount importance on Citigroup's risk management, internal controls and compliance systems, policies and practices, purportedly investing heavily to ensure their effective functioning, and that the Company had put in place the infrastructure, process and procedures necessary to address its regulatory shortcomings.

19.    Unbeknownst to investors, during the Class Period, despite defendants' repeated statements to the contrary, Citigroup had failed to take the steps necessary to bring its risk management and compliance practices in line with regulatory standards or its obligations under the consent orders and, as a result, was continuing to expose the Company to heightened regulatory, operational, reputational and financial risk.   Specifically, defendants concealed Citigroup's failure to:

(a)    implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Company's size, complexity, and risk profile;

(b)    establish an effective risk governance framework;

(c)    establish enterprise-wide risk management policies, standards, and frameworks necessary to adequately identify, measure, monitor, and control risks;

(d)      establish effective front-line units, independent risk management, internal audit, and control functions; and

(e)      develop and execute on a comprehensive plan to address data governance deficiencies, including data quality errors and failure to produce timely and accurate management and regulatory reporting.

**Materially False and Misleading Statements**
**Issued During the Class Period**

20.      The Class Period starts January 15, 2016.  On that date, Citigroup issued a press release announcing its financial results for the quarter and year ended December 31, 2015.  For the quarter, the Company reported net income of $3.3 billion, or $1.02 per diluted share, on revenues of $18.5 billion.  Defendant Corbat commented on the results, stating in pertinent part as follows:

> "***We have made sustainable investments*** not only in our capital planning process but also ***in the risk, control and compliance functions, which are critical to maintaining our license to do business***.  We have undoubtedly become a simpler, smaller, ***safer and stronger institution*** . . . ."

21.      On February 26, 2016, Citigroup filed its Form 10-K for the period ended December 31, 2015 with the SEC, which was signed by defendants Corbat and Gerspach (the "2015 Form 10-K").  With respect to risk management, the 2015 Form 10-K stated in pertinent part as follows:

> ***For Citi, effective risk management is of primary importance to its overall operations.  Accordingly, Citi's risk management process has been designed to monitor, evaluate and manage the principal risks it assumes in conducting its activities***.
>
> *            *            *
>
> The Compliance organization is designed to protect Citi not only by managing adherence to applicable laws, regulations, and other standards of conduct, but also by promoting business behavior that is consistent with Citi's

mission and value proposition, the principle of responsible finance and Citi's compliance risk appetite.

22.     The 2015 Form 10-K also purported to set forth the Company's risk management and internal controls with respect to various types of risk, including Operational Risk, which is the risk of loss resulting from inadequate or failed internal processes, systems or human factors, or from external events.  With respect to operational risk faced by Citigroup, the 2015 Form 10-K stated in pertinent part as follows:

> *To anticipate, mitigate and control operational risk, Citi maintains a system of policies and has established a consistent framework for monitoring, assessing and communicating operational risks and the overall operating effectiveness of the internal control environment across Citigroup.*
>
> *            *            *
>
> In addition, Risk management, including Operational Risk Management, works proactively with the businesses and other independent control functions to *embed a strong operational risk management culture and framework across Citi.*  Operational Risk Management engages with the businesses and the respective Chief Risk Officers to ensure effective implementation of the Operational Risk Management framework by focusing on (i) identification, analysis and assessment of operational risks; (ii) effective challenge of key control issues and operational risks; and (iii) anticipation and mitigation of operational risk events.

23.     The 2015 Form 10-K also included management's annual report on internal controls over financial reporting, which stated that management reviewed the Company's internal controls and found them to be effective.  The 2015 Form 10-K stated in in pertinent part as follows:

> Citi's management is responsible for establishing and maintaining adequate internal control over financial reporting.  *Citi's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.*  Citi's internal control over financial reporting includes those policies and procedures that (i) *pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of Citi's assets*; (ii) provide reasonable assurance that transactions are

- 9 -

recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, **and that Citi's receipts and expenditures are made only in accordance with authorizations of Citi's management and directors**; and (iii) **provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Citi's assets** that could have a material effect on its financial statements.

24.     Attached to the 2015 Form 10-K were Sarbanes-Oxley ("SOX") certifications executed by defendants Corbat and Gerspach.   Included in the SOX certifications were representations by Corbat and Gerspach that: (i) the 2015 Form 10-K did not contain any material misstatement or mission; (ii) they were responsible for establishing and maintaining the disclosure controls and procedures; and (iii) the Company's internal controls over financial reporting, as well as its disclosure controls, were operational and effective.[2]   The SOX certifications stated in relevant part as follows:

> 4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and **internal control over financial reporting** (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> *        *        *
>
> b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation . . . .

---

[2]   Each of the subsequent Forms 10-K for the fiscal years 2016 to 2019 included the following: (i) management's annual report on internal controls over financial reporting, which stated in nearly identical form that management had reviewed the Company's internal controls and found them to be effective at the time; and (ii) the SOX certifications of defendants Corbat and Gerspach (for fiscal years 2016 to 2018) and of defendants Corbat and Mason (for fiscal year 2019).

25.     On February 24, 2017, Citigroup filed its Form 10-K for the period ended December 31, 2016 with the SEC, which was signed by defendants Corbat and Gerspach (the "2016 Form 10-K").  The 2016 Form 10-K reiterated the Company's representations concerning internal controls and risk management that had appeared in the 2015 Form 10-K, including in pertinent part as follows:

> *For Citi, effective risk management is of primary importance to its overall operations.  Accordingly, Citi's risk management process has been designed to monitor, evaluate and manage the principal risks it assumes in conducting its activities*.
>
> *       *       *
>
> *Citi's firm-wide Risk Governance Framework consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports, and controls risks across the firm. . . .  The Risk Governance Framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards*.  It is also aligned with the relevant components of the Basel Committee on Banking Supervision's corporate governance principles for banks and relevant components of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations.

26.     The 2016 Form 10-K further represented that in April 2016, the Company had formed a new Finance & Risk Infrastructure ("FRI") group for the purpose of, among other things, improving data quality and technology use across the Company.  The 2016 Form 10-K stated in in pertinent part as follows:

> *FRI was established to globally implement common data and data standards, common processes and integrated technology platforms as well as integrate infrastructure activities across both Finance and Risk*.  FRI works to drive straight through data processing and produce more effective and efficient processes and governance aimed at supporting both the Finance and Risk organizations.

27.     On January 4, 2018, the OCC issued a press release stating that a Consent Order for a Civil Money Penalty (dated December 27, 2017) had been entered into with Citibank.  The OCC assessed a $70 million civil money penalty against Citibank for failing to comply with the

agency's 2012 Consent Order related to BSA and AML deficiencies.  The Consent Order for a

Civil Money Penalty stated in relevant part:

> **The Bank is in violation of a prior OCC Consent Cease and Desist Order for BSA/AML deficiencies issued on April 5, 2012 (2012 Consent Order), in which the OCC identified deficiencies in the Bank's Bank Secrecy Act/anti-money laundering ("BSA/AML") compliance program** . . . .

*      *      *

> **The Bank has not timely achieved compliance with the 2012 Consent Order and is in violation of the 2012 Consent Order (from September 30, 2015, to the date of this Order)**.

28.     On January 4, 2018, *The Wall Street Journal* published an article, titled "Citi

Fined for Failing to Fix Money-Laundering Controls," reporting that the OCC had found that

Citigroup had failed to fully comply with the 2012 Consent Order and had issued a $70 million

penalty.   The  article  quoted  a  Citigroup  spokesperson,  who  falsely  assured  investors  of

Citigroup's purported commitment to the necessary remedies.  The article stated in relevant part:

> "**Citi is committed to taking all necessary and appropriate steps to remedy the concerns identified by the OCC**," a spokesman said.  "**We have made substantial investments to enhance our [anti-money-laundering] programs** and we maintain a commitment to developing an industry-leading program to help to protect the integrity of the financial system."

29.     On January 16, 2018, Citigroup issued a press release announcing its financial

results for the quarter and year ended December 31, 2017.  The Company reported a net loss for

the quarter of $18.3 billion, or ($7.15) per diluted share, on revenues of $17.3 billion.

30.     Following the issuance of the press release, Citigroup held a conference call with

analysts and investors to discuss its financial results and operations.  During the conference call,

defendant Gerspach addressed the Company's ongoing improvements to compliance and risk

infrastructures, claiming that these investments would confer even greater benefit in 2019 and

2020, stating in pertinent part in follows:

But there's also ***reengineering*** in some of our, what I'm going to ***call core infrastructures, our global functions, whether that be compliance, finance, risk***. There's still work that we can do there.  And we should start to see, again, an ***increased benefit coming out of those types of activities in '19 and '20***.

31.     On February 23, 2018, Citigroup filed its Form 10-K for the period ended December 31, 2017 with the SEC, which was signed by defendants Corbat and Gerspach (the "2017 Form 10-K").   The 2017 Form 10-K contained many of the same representations concerning internal controls and risk management that had appeared in the 2016 Form 10-K, including in pertinent part as follows:

> ***For Citi, effective risk management is of primary importance to its overall operations.  Accordingly, Citi's risk management process has been designed to monitor, evaluate and manage the principal risks it assumes in conducting its activities***.
>
> \*          \*          \*
>
> Citi's Company-wide risk governance framework consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports and controls risks across the Company. . . .   ***The risk governance framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards***. It is also aligned with the relevant components of the Basel Committee on Banking Supervision's corporate governance principles for banks and ***relevant components of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies*** and Foreign Banking Organizations.

32.     On July 13, 2018, Citigroup held an earnings conference call with analysts and investors to discuss the Company's financial results and operations for the quarter ended June 30, 2018.  During the conference call, defendants emphasized the Company's transition from utilizing manual or analog systems to digital and automated systems to support their business functions, which would be both more efficient and eliminate potential risk of error.  Defendants Corbat and Gerspach stated in pertinent part as follows:

> [Gerspach:]  As you would expect, many of those benefits are driven by our ***digital transformation***.

\*      \*      \*

[Corbat:]  [Y]ou need to look at the expense side because again *a lot of the investments we're making are in this transformation from what has historically largely been an analog business to a digital platform*. . . .  That's – the uptakes we think have been strong, and it's accelerating and we think that continues to accelerate.  *And then over time, we get to pull out the analog and largely run on the back of the digital platforms that we've built.  And that should manifest itself largely in the expense line*.

33.     On February 22, 2019, Citigroup filed its Form 10-K for the period ended December 31, 2018 with the SEC, which was signed by defendants Corbat and Gerspach (the "2018 Form 10-K").  The 2018 Form 10-K repeated the Company's representations concerning internal controls and risk management that had appeared in its prior 2017 Form 10-K, including in pertinent part as follows:

> *For Citi, effective risk management is of primary importance to its overall operations.  Accordingly, Citi's risk management process has been designed to monitor, evaluate and manage the principal risks it assumes in conducting its activities*.

\*      \*      \*

> *Citi's Company-wide risk governance framework consists of the policies, standards, procedures and processes through which Citi identifies, assesses, measures, manages, monitors, reports and controls risks across the Company*. It also emphasizes Citi's risk culture and lays out standards, procedures and programs that are designed and undertaken to enhance the Company's risk culture, embed this culture deeply within the organization, and give employees tools to make sound and ethical risk decisions and to escalate issues appropriately. *The risk governance framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards*.

34.     On July 15, 2019, Citigroup held a conference call with analysts and investors to discuss the Company's financial results and operations for the quarter ended June 30, 2019. During the call, defendants again provided investors with assurances that the Company was continuing its emphasis on improving the Company's risk controls and infrastructure, including

technology to improve data quality, which would lead to a safe and more sound organization.

Defendants Corbat and Mason stated in pertinent part as follows:

> [Corbat:]  However, *we won't change our commitment to safety and soundness and to making investments necessary to strengthen our infrastructure and control environment*.
>
> *        *        *
>
> [Analyst:]  And then the longer-term question is, how much runway do you have left with technology to improve Citigroup's efficiency?
>
> *        *        *
>
> [Mason:]  We do continue to invest in technology.  *In fact, what you heard me mention earlier in terms of one of the protected areas, being infrastructure and control, there [are] a couple of – there are different ways to look at that protected areas as we invest in technology around our infrastructure and improve the data quality that we have and things of that sort.  Not only does it help us run a safer and more sound organization, but it also arms us with information sooner to enable us to react and serve our clients more quickly*.
>
> *        *        *
>
> [Corbat:]  And I think from a – *the way I think about it is, today, we really run the combination of an analog and a digital bank*.  And the faster we can continue to drive digital adoption mobile usage, we know that that's cheaper.

35.     On October 15, 2019, Citigroup held a conference call with analysts and investors to discuss the Company's financial results and operations for the quarter ended September 30, 2019.  During the conference call, defendants stated that the Company continued to invest in infrastructure and control, which they claimed would ensure that Citigroup operated in compliance with its regulatory obligations.  Specifically, defendants claimed that certain of these investments would be directed at replacing manual processes with automated ones, which would purportedly reduce the Company's risk exposure to human error.  Defendants Corbat and Mason stated in pertinent part as follows:

> [Analyst:]  And then just a separate one on – you mentioned there's a continuing investment in controls and risk, in corporate and other.  Are you close

- 15 -

to a point where you've reached a peak on that?  Would you expect that to trend down over time?  Or is it still something that's increasing?

. . . [Mason:]   We think that's important to make as a franchise.  ***That includes*** things like enhancing our data capabilities.  It includes things like . . . improving ***our compliance and risk and finance infrastructure.  So all of those things that we think are critical to not only running a safe and sound organization***, but in many ways, to helping to drive better business operations as well.  And so yes, we expect to continue to make investments in that area.

. . . [Corbat:]  ***[I]t's not just the investment in the safety and soundness, but there's paybacks in the round on that in terms of being able to replace manual processes and other things***.

. . . [Mason:]  ***Between the automation opportunities that are there, the straight-through processing opportunities that are there***, that's what I was alluding to when I said the opportunity to improve business operations.  ***So it's safety and soundness and those efficiencies that we'll get as an organization***.

36.    On January 14, 2020, Citigroup issued a press release announcing its financial results for the quarter and year ended December 31, 2019.  The Company reported net income for the quarter of $5.0 billion, or $2.15 per diluted share, on revenues of $18.4 billion.

37.    Following the issuance of the earnings release, Citigroup held a conference call with analysts and investors to discuss the Company's 2019 financial results and operations. During the conference call, defendants emphasized that Citigroup's investment in technology and infrastructure was effectively strengthening the Company's internal controls and data integrity, with a purported focus on shifting the business to more automated processes and a reduction in manual work.   These investments, according to defendants, had substantially reduced the risks impacting Citigroup's business and would continue to reduce such risks going forward.  Defendants Corbat and Mason stated in pertinent part as follows:

[Corbat:]  ***We continue to invest*** in areas where we see opportunities for client-led growth and in our ***infrastructure***, in light of the enduring need to be an indisputably strong and stable institution.

*          *          *

[Mason:]  And then we are – and I've referenced the investments that we continue to – want to continue to make or will continue to make, *in infrastructure and controls.  And those investments will be in the form of technology and people and focused on things such as data, data governance and infrastructure*.

*        *        *

[Analyst:]  Can you talk about technology spend and where you are in the process and priorities for the back office and the front office? . . .  And then just overall, with total tech spend and where you are in terms of spending or reaping the benefits of past spend.

*        *        *

[Mason:]  *The third bucket is just how we streamline our own operations, our own internal processes, how we do more in the way of automation, less manual reconciliation and manual work*.

38.    On February 21, 2020, Citigroup filed its Form 10-K for the period ended December 31, 2019 with the SEC, which was signed by defendants Corbat and Mason (the "2019 Form 10-K").  The 2019 Form 10-K repeated the Company's representations concerning internal controls and risk management that had appeared in its prior 2018 Form 10-K, stating in pertinent part as follows:

> *For Citi, effective risk management is of primary importance to its overall operations.  Accordingly, Citi's risk management process has been designed to monitor, evaluate and manage the principal risks it assumes in conducting its activities*.
>
> *        *        *
>
> *Citi's Company-wide risk governance framework consists of the key policies, standards and processes through which Citi identifies, assesses, measures, monitors and controls risks across the Company*.  It also emphasizes Citi's risk culture and lays out standards, procedures and programs that are designed to set, reinforce and enhance the Company's risk culture, integrate its values and conduct expectations into the organization, providing employees with tools to assist them with making prudent and ethical risk decisions and to escalate issues appropriately.

39.    On April 15, 2020, Citigroup held a conference call with analysts and investors to discuss the Company's first quarter 2020 financial results.  During the conference call, defendant

Corbat stated that Citigroup's risk management and controls were functioning well, stating in pertinent part as follows:

> *The investments we've made in our technology have allowed us to operate very smoothly . . . . Our investments in risk management and controls, while never complete, are also serving us well* in the face of a severe economic downturn and large swings across markets, whether in equities, fixed income or commodities.

40.     On April 21, 2020, the Company held its annual shareholders meeting, hosted by defendant Corbat.  During the meeting, defendant Corbat stated in pertinent part as follows:

> In terms of Citi, *the hard work we've put in over the past several years towards our goal of being an indisputably strong and stable institution has put us in very good position*, from a capital, liquidity and balance sheet perspective, to get through this.  We have the resources we need to serve our clients *without jeopardizing our safety and soundness, and our investments in risk management and controls, while never complete, are serving us well in the face of a severe economic downturn and the accompanying market volatility*.
>
>                     *        *        *
>
> Our results were driven by revenue growth and disciplined expense management, *even as we continue to make significant investments in our franchise, including in our technology infrastructure and controls*.

41.     On July 14, 2020, Citigroup held a conference call with analysts and investors to discuss the Company's second quarter 2020 financial results hosted by defendants Corbat and Mason.  During the conference call, defendant Corbat reiterated the Company's purportedly "sharp" focus on risk management and controls, stating in pertinent part as follows:

> [Corbat:] *We'll keep managing through this with a sharp emphasis on our risk management.  We continue to make investments in our infrastructure to enhance our safety, soundness and controls to ensure that we have an indisputably strong and stable institution*.
>
>                     *        *        *
>
> [Mason:] *And we continue to feel good about the investments we are making, particularly in our digital capabilities and infrastructure and control*.

42.     The statements referenced above in ¶¶20-26, 29-41 were materially false and misleading when made as they failed to disclose the following adverse material facts, which were known to or recklessly disregarded by defendants:

(a)     that Citigroup had failed to make the investments required to address its regulatory shortcomings;

(b)     that the Company had failed to implement and establish the requisite internal controls, risk management and data governance processes to comply with regulatory requirements, existing consent orders, and applicable laws and regulations;

(c)     that the Company was currently exposed to significant financial and operational risk, including risk from outdated and manual processes that left the Company susceptible to material accounting errors;

(d)     that the Company was currently suffering from material deficiencies in its policies, procedures and practices applicable to data integrity and data governance and had failed to develop and execute on a plan to address these deficiencies as required by regulators;

(e)     that the Company lacked the required personnel with appropriate training, experience and authority to implement the required risk management and internal controls; and

(f)     that, as a result of the foregoing, the Company had engaged in unsafe and unsound business practices that exposed it to heightened regulatory, legal, business and reputational risks.

43.     On August 13, 2020, *The Wall Street Journal* published an article titled "Citigroup Pays Revlon Lenders Nearly $900 Million by Mistake."  The article reported that Citigroup had improperly paid $900 million to certain lenders of Revlon as a result of an "operational error."  Furthermore, several of the lenders had refused to return the money and the

Company had been forced to seek court intervention to retrieve the funds.  The article stated in pertinent part as follows:

> Citigroup Inc. paid nearly $900 million by mistake to Revlon Inc. lenders and is asking for the money to be returned, according to people familiar with the matter.
>
> Lenders that sued Revlon on Wednesday over its debt-restructuring tactics were surprised Thursday they had been fully repaid on a loan issued in 2016, these people said.  *Citi executives were soon asking for the money back, saying it was paid inadvertently due to an operational error*, the people familiar said.

44.    In response, the price of Citigroup stock declined from $53.35 per share on August 12, 2020 to $52.89 per share on August 13, 2020.

45.    On August 17, 2020, *The Wall Street Journal* published an article titled "Citi Sues Revlon Lender Brigade for Return of Payment It Says Was a Mistake."  The article revealed that the improper payment to lenders in the Revlon matter had involved Citigroup's own funds and had been characterized by the Company as an "operational mistake[]."  Citigroup characterized its error as so significant that it claimed if the lenders did not repay the funds this failure would threaten the stability of the entire banking system.  The article stated in pertinent part as follows:

> Revlon has said it didn't pay the money itself.  *In the lawsuit, Citi said the payment on a loan issued by Revlon in 2016 came from the bank's own funds*.
>
> *     *     *
>
> *"Any other outcome would threaten the stability of the banking system and the relationships between administrative agents and lenders, as it would reward bad actors that try to capitalize on operational mistakes," Citi said in the lawsuit*.
>
> *     *     *
>
> The bank said it had intended to pay the lenders several months of accrued interest under the company's credit agreement.  *Blaming "issues with the loan-processing system," Citi said it transferred payments to each lender that were "on average more than 100 times the interest that was actually due."*

46.     In response, the price of Citigroup stock declined from $52.93 per share on August 14, 2020 to $51.42 per share on August 17, 2020.

47.     On August 19, 2020, *The Wall Street Journal* published an article titled "Citi Widens Hunt for Revlon Loan Payments as Lenders Question Mistake."  The article described the mistaken Revlon payment as a consequence of "unthinkable" "human error."  The article stated in pertinent part as follows:

> Citigroup Inc. widened its effort to claw back money it wired to Revlon Inc. lenders, suing more investment firms that say they don't believe a major financial institution sent them portions of a $900 million payment by mistake.
>
> . . . ***The bank has blamed human error for the transactions, which fully paid off a loan issued by Revlon in 2016 out of the bank's own funds***.
>
> *      *      *
>
> Brigade, HPS and Symphony aren't conceding there was a mistake, suggesting the payment may have been intentional and ***questioning how Citi could have transferred such a huge sum in error***.
>
> *      *      *
>
> ***Citi lawyer Matthew Ingber said it is unthinkable that the bank would intentionally make hundreds of millions of dollars in payments to the lenders out of its own pocket***.  The bank is weighing its options against other lenders keeping the money, including additional lawsuits, he said.

48.     In response, the price of Citigroup stock declined from $50.29 per share on August 19, 2020 to $49.58 per share on August 20, 2020.

49.     On September 7, 2020, *The Wall Street Journal* published an article, titled "Citigroup Feuds With Hedge Funds Over Botched Payment," which reported that Citigroup's manual checks had failed to detect the mistaken payment and the fiasco had laid bare Citigroup's failure to implement effective internal controls and compliance systems.  The article stated in pertinent part as follows:

- 21 -

> *For Citi, the dispute, and especially the mistaken payment, have added to a string of missteps over the past decade, raised questions from analysts about the bank's internal controls and drawn the attention of regulators.*

> \*       \*       \*

> *The bank said in a court filing it had planned to disburse only an interest payment it received from Revlon.  Instead, it paid more than 100 times as much – out of Citi's own funds – because of a human processing error that wasn't caught in subsequent manual checks, according to the filing.*

> *"We . . . recognize that an operational error of this nature is unacceptable," a Citi spokeswoman said, "We have put significant, additional controls in place until the new system is operational."*

50.     In response, the price of Citigroup stock declined from $52.52 per share on September 4, 2020 to $51.04 per share on September 8, 2020, on abnormally high trading volume.

51.     On September 10, 2020, Citigroup issued a press release, which was filed with the SEC as an attachment to a Form 8-K, abruptly disclosing that defendant Corbat would be replaced as CEO in February 2021, but without any mention of the reasons for his departure. The same day, Wells Fargo issued an analyst report, titled "New CEO Can Give a Fresh Look," which noted that the timing was unusual, stating in pertinent part as follows:

> For this reason, *the timing seems unusual and the news is unexpected* – CEOs don't typically want to leave in the middle of a crisis, esp. if upside is pending.

52.     On September 14, 2020, defendant Mason, on behalf of Citigroup, presented at the Barclay's Global Financials New York Conference.  During the conference, defendant Mason stated in pertinent part as follows:

> *Beyond this, the next phase will also include a focus on transforming our risk and control environment, to achieve long-term operational excellence.*  Now I would note that we have already been investing in our infrastructure and controls in the way we operate over the past few years. . . .  And while our ability to quickly access information to make smart decisions and manage risk throughout the crisis has been reassuring, *we recognize that we are still not where we need to be.*

- 22 -

*An example of this would be the recent operational error related to a loan facility we administer for Revlon, which included manual steps to our loan processing system.  We recognize that errors like this are unacceptable.  And we also recognize that eliminating these types of manual touch points is a significant opportunity for us.  This is why we've been accelerating our investment in infrastructure and controls, with over $1 billion in incremental investments planned for this year alone, to ensure that we operate in a safe and sound manner and serve our clients and customers with excellence*.  I cannot emphasize enough, there is no greater priority for the entire management team than getting to what we would characterize as a best-in-class risk and control environment.

*Simply put, fundamentally transforming our operating environment and strengthening our infrastructure risk and controls is a strategic priority for the firm*. . . .

There is a strategic component, establishing an end-state vision for our key processes in order to ensure horizontal alignment and end-to-end process improvement across the organization.  And there's also an operational component behind getting this right, *including investments in data and technology to drive automation and the elimination of manual touch points*.

\*     \*     \*

*So one, the Revlon issue, as I mentioned, was a mistake.  It was a manual breakdown in our operations tied to a system that we are in the process of migrating to a new platform and new system*.

\*     \*     \*

I think in a broader sense, you heard me reference a number of times, and Mike mentioned it in his letter last week, *the importance of making risk and controls in our infrastructure a strategic imperative*.  And you heard us mention the need for investments in that area and the fact that we've been making investments in that area for a number of years now.  And we're going to continue to do that.  *And it's things like manual touch points and being able to accelerate straight-through processing and automation.  It's things like data*.

And I would say that, today, we've got very good data.  *But when I look at the process involved, with ensuring that the data quality is what we need it to be, there are opportunities for that to function more efficiently.  That is to say ensuring that the quality of the data as we bring it in is of the standard that we need as opposed to having to do manual changes and adjustments along the way to ensure that it's of the quality that it is and what we need it to be.  So this is a priority for us.  And it's one that we're committed to and looking forward to executing against*.

- 23 -

53.     The same day, September 14, 2020, *The Wall Street Journal* published an article titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems; Moves accelerated plans for CEO Michael Corbat's retirement."  The article revealed that the OCC and the Federal Reserve were preparing to reprimand Citigroup – in the form of a consent order – for failing to sufficiently improve risk management, and that the regulators' actions were the driving force behind Corbat's unexpected resignation.  The article stated in pertinent part as follows:

> *Federal regulators are preparing to reprimand Citigroup Inc. for failing to improve its risk-management systems – an expansive set of technology and procedures designed to detect problematic transactions, risky trades and anything else that could harm the bank*.
>
> *The expected rebuke from the Office of the Comptroller of the Currency and the Federal Reserve accelerated planning for Chief Executive Michael Corbat's retirement, according to people familiar with the matter*.
>
> *                *                *
>
> A consent order likely would require Citigroup to develop and execute a plan to fix its risk systems, the people said.  Such formal regulatory actions sometimes come with fines or stricter oversight, but it isn't clear what, if any, punishment would be imposed, they said.
>
> "*We are completely committed to improving our risk and control environment*," *a Citigroup spokeswoman said, citing the bank's efforts to strengthen controls, infrastructure and governance.  "However, while we have made significant and demonstrable progress in each of these areas, we recognize that we are not yet where we need to be and that has to change*."
>
> *                *                *
>
> *For years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems, according to people familiar with the matter*.  A public rebuke would significantly ratchet up the pressure.  The Fed and the OCC have many tools at their disposal to address problems out of the public eye.  A consent order indicates that those methods didn't achieve the desired results.
>
> *Regulators have faulted Citi's management for not giving priority to the risk-management overhaul, the people said.  A recent high-profile flub, Citigroup's accidental $900 million payment to creditors of cosmetics company Revlon Inc., was seen as evidence of weaknesses in the system, the people said*.
>
> *                *                *

- 24 -

*In memos to Citigroup staff Thursday, both Mr. Corbat and Ms. Fraser acknowledged that the bank needs to transform its internal systems for risk and compliance.*

Mr. Corbat is widely credited with sharpening the bank's focus and reducing its sprawl during his eight years as CEO. *Yet the bank has long struggled to convince regulators that it was moving fast enough to address their concerns.*

\* \* \*

*Citigroup is still operating under consent orders from 2012 and 2013 that required it to improve its anti-money-laundering processes. The OCC fined it in 2017 for failing to comply with the 2012 order.*

\* \* \*

Banking regulators require banks to track customers across all of their operations. The idea is to catch crimes like money laundering and avoid errors, intentional or otherwise, that could harm customers. *While Citigroup is able to keep tabs on customers across its businesses, regulators worry that its mishmash of systems makes it vulnerable to costly and potentially damaging missteps, people familiar with the matter said.*

*Citigroup in recent months has tried to highlight its efforts to shore up its systems and convince regulators it is taking their concerns seriously.*

54.    The same day, September 14, 2020, *Business Insider* published an article titled "Read the memo Citi CEO Mike Corbat sent staff quoting race car driver Mario Andretti to get employees to take risk and controls more seriously."  The article included the full text of an internal memo defendant Corbat had sent to all Citigroup employees, dated August 10, 2020 (but not previously made public), in which defendant Corbat internally acknowledged that Citigroup had not achieved the necessary level of internal controls and infrastructure.  The memo stated in relevant part as follows:

In recent years, we have been working on significant remediation projects to strengthen our controls, infrastructure and governance. *While we have made progress, we have work to do to meet the standards that we must hold ourselves to.*

\* \* \*

- 25 -

> *One thing has become very clear to me . . . we need to think about infrastructure and controls very differently.  We can't think of them as just something that is important to our regulators.  It's not about getting remediation projects done or checking boxes.*

*       *       *

> Simply put, to Be the Best for Our Clients and serve all our stakeholders, *we first need to have an industry-leading risk and control environment.  Getting this right will help us serve our clients better, win new ones, onboard them faster, and provide them with the assurance that they are doing business with an indisputably strong and stable institution.*

85.     In response, the price of Citigroup stock declined from a close of $51.00 per share on September 11, 2020 to a close of $48.15 per share on September 14, 2020 (the next trading day), on a high volume of 58 million shares traded.

55.     On September 15, 2020, *Business Insider* published another article, titled "The real reasons behind Citigroup CEO Mike Corbat's retirement," which stated that regulators had been pressuring Citigroup to take more aggressive action to remedy its internal control and risk management failings.  The article stated in pertinent part as follows:

> Authorities at the Office of the Comptroller of the Currency and the Federal Reserve are now preparing to punish Citigroup for failing to fix its control systems, The Wall Street Journal reported Monday.  Regulators are expected to issue a consent order requiring the bank to fix its risk systems, the newspaper said.

*       *       *

> *The decision is a result of earlier efforts to persuade Citigroup to fix its risk controls.  Entering this year, for example, Citigroup had numerous outstanding compliance- and technology-related issues that had been outlined in regulatory notices known as Matters Requiring Attention and Matters Requiring Immediate Attention, according to one of the people familiar with the matter.*

> *Citigroup had multiple ones long past due, the person added.*

> *The notices are issued privately by regulators when they find controls or systems that aren't up to standards, and they typically come with firm deadlines*

- 26 -

*by which the bank is expected to fix the weaknesses or present a plan to do so*. The board of directors is often included on those communications.

As 2020 progressed, tensions with regulators mounted, a second source familiar with the matter said. *Authorities were annoyed with Citigroup's noncompliance across numerous issues and felt as if they weren't being heard, the person said*.

\*     \*     \*

The episode was just the latest reminder that the controls of the bank were still not up to par in some areas, 12 years after the financial crisis laid bare a patchwork of technology systems that didn't talk to one another.

\*     \*     \*

*While many banks have spent years improving their systems, the fines and lack of progress were a testament to Corbat's focus on cost controls, one of the people said. The CEO who had made operating efficiency and return-on-equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way, the person said*.

56.     On September 15, 2020, Piper Sandler issued an analyst report on Citigroup titled "Potential Regulatory Action Drives What We Believe To Be An Overdone Sell-off." The report reduced earnings estimates for the Company and noted that the price of Citigroup stock had declined in response to the threat of an OCC consent order. The analyst report stated in pertinent part as follows:

C shares came under pressure Monday afternoon in the wake of management providing modestly more conservative 3Q20 outlook commentary at an industry conference and an article in the financial press suggesting that regulators are preparing to reprimand C for failing to improve its risk management systems.

\*     \*     \*

*We believe yesterday afternoon's sell-off was primarily driven by regulatory headlines . . . . C's share price declined meaningful yesterday after the Wall Street Journal reported that C faces a potential consent order from the OCC and Federal Reserve for failing to adequately improve its risk management systems*.

\*     \*     \*

- ***Our 2020 EPS estimate reduction is primarily driven by a combination of increased expenses (including $200M of Revlon related charges)*** and increased credit provisions, which are substantially offset by larger reserve releases in 2H21.

57.     In response, the price of Citigroup stock declined from a close of $48.15 per share on September 14, 2020 to a close of $44.81 per share on September 15, 2020, on extremely high volume of 84 million shares traded.

58.     On September 16, 2020, Wells Fargo issued a report, titled "C: Investors Are Upset; Citi Should Consider Accelerating CEO Transition," which stated that Citigroup had failed to honestly apprise investors about the true reasons for Corbat's retirement.  The analyst report further stated that the Company's control systems shortcomings should have been addressed years ago but had not.  The analyst report stated in pertinent part as follows:

> We have 3 follow up points regarding Citi's recently disclosed control issues.  ***First, investors are upset because a CEO retirement/transition that was billed by the company as normal course of business seems increasingly not the case, given possible new regulatory actions***. . . .  Third, the possible pending regulatory action should not be worst case (asset cap, forced sales, C&D), and the likelihood that this situation escalates to a Congressional hearing seems low. First, regulators have monitored Citi's controls for a decade; second, no customers were harmed (that we know of); and, ***third, the recent mishap (Revlon) seems like a manifestation of problems from systems and processes that should have been addressed years ago via improved automation (an issue for Citi firmwide)***.

59.     On October 7, 2020, the OCC announced the entry of a consent order and civil money penalty against Citigroup and its subsidiary Citibank related to risk management, data governance and internal control deficiencies.  The OCC further imposed a $400 million fine on the Company.  The consent order included, *inter alia*, the following findings:

> (1)     ***For several years, the Bank has failed to implement and maintain an enterprisewide risk management and compliance risk management program, internal controls, or a data governance program*** commensurate with the Bank's size, complexity, and risk profile.

(2)     The OCC has identified the following deficiencies, noncompliance . . . or unsafe or unsound practices with respect to the Bank's ***enterprise-wide risk management and compliance risk management program***:

> (a)     ***failure to establish effective front-line units and independent risk management*** . . . ;
>
> (b)     ***failure to establish an effective risk governance framework*** . . . ;
>
> (c)     ***failure of the Bank's enterprise-wide risk management policies, standards, and frameworks to adequately identify, measure, monitor, and control risks***; . . .

*     *     *

(3)     ***The OCC has identified unsafe or unsound practices with respect to the Bank's internal controls, including, among other things, an absence of clearly defined roles and responsibilities and noncompliance with multiple laws and regulations***.

(4)     ***The OCC has identified the following deficiencies, noncompliance . . . or unsafe or unsound practices with respect to the Bank's data quality and data governance***, including risk data aggregation and management and regulatory reporting:

> (a)     ***failure to establish effective front-line units, independent risk management, internal audit, and control functions*** . . . ;
>
> (b)     ***inability to develop and execute on a comprehensive plan to address data governance deficiencies, including data quality errors and failure to produce timely and accurate management and regulatory reporting***; . . .

*     *     *

(5)     In addition . . . the OCC has determined that ***Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank***. . . .

(6)     By reason of the foregoing conduct, the Bank was in noncompliance . . . and engaged in unsafe or unsound practices that were part of a ***pattern of misconduct***.

(7)  . . . Among other things, the Bank's deficiencies in internal controls and compliance risk management **have contributed to violations of laws and regulations** and the OCC assessed civil money penalties in 2019 based specifically on violations of the Fair Housing Act . . . ; violations of the holding period for other real estate owned . . . and in 2020 based specifically on violations of the Flood Disaster Protection Act . . . .

60.     The same day, the Federal Reserve issued a Cease and Desist Order to Citigroup stating that the Company still had significant ongoing deficiencies enterprise-wide related to risk management, internal controls, and compliance.  The Cease and Desist Order also stated that the Company had failed to adequately remedy the issues previously addressed by prior consent orders, stating in pertinent part as follows:

[T]he most recent supervisory assessment of Citigroup issued by the Federal Reserve Bank of New York ("Reserve Bank") identified **significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management** . . . .

. . . **Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve**, including in the areas described above and those addressed in (i) the Consent Order issued by the Board of Governors on March 21, 2013 to remediate outstanding deficiencies in Citigroup's antimoney laundering compliance program and (ii) the Consent Order issued by the Board of Governors on May 20, 2015 to remediate outstanding deficiencies in Citigroup's compliance and control infrastructure relating to its foreign exchange program and designated market activities . . . .

61.     On October 13, 2020, Citigroup issued a press release announcing its financial results for the third quarter of 2020, including net income of $3.2 billion, or $1.40 per diluted share, on revenues of $17.3 billion.  The press release stated that **net income had declined 34%** from the prior-year period, driven in part by an increase in expenses, including the $400 million civil money penalty imposed on Citigroup in connection with the recent OCC consent order.

62.     The same day, October 13, 2020, the Company held an earnings conference call for analysts and investors.  During the call, defendants Corbat and Mason contradicted

defendants' Class Period representations and belatedly admitted that the Company had not moved quickly enough to address risk management and internal control deficiencies. Defendants further revealed that the required fixes would not be "quick" or "easy," and that the ultimate costs to implement the required remedies were still unknown and a further "GAAP analysis" was required to make such an estimate. Defendant Mason also stated that the $400 million fine negatively impacted Citigroup's quarterly earnings by $0.19 per share. Defendants Corbat and Mason stated in relevant part as follows:

> [Corbat:] Turning to the consent orders. They focus on four areas that impact our risk and control environment: risk management, data governance, controls and compliance. ***What ties these areas together is the need to modernize our infrastructure, governance and processes. We've had remediation programs in place***.
>
> ***And while we've been making progress in these areas, we're simply not where we need to be. While this is disappointing, we're committed to thoroughly addressing the issues identified in the orders and modernizing our bank***. . . .
>
> We're laser-focused on reducing manual touch points, automating processes and ensuring accurate data can be accessed quickly when we're producing management and regulatory reports. . . . ***This won't be a quick or easy fix***. We need to conduct an in-depth GAAP analysis to ensure our solutions are tailored to the issues we face and get us to the necessary end state.
>
> ***While we can't fully scope out the cost yet for a multiyear transformation***, I can tell you with certainty that we're committing all the necessary resources while continuing to serve our clients. . . . So these are investments we need to make.
>
> ***In hindsight, we should have done them faster and prevented it from coming to this***.
>
>       *   *   *
>
> [Mason:] ***Reported results also include the $400 million civil money penalty in connection with the consent orders that Mike just mentioned, which negatively impacted EPS by $0.19***.

- 31 -

63.     On this disclosure, the price of Citigroup stock declined from a close of $45.88 per share on October 12, 2020 to a close of $43.68 per share on October 13, 2020, on elevated volume of 50 million shares traded.

64.     As a result of defendants' wrongful acts and omissions, and the declines in the price of Citigroup common stock as detailed herein, plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

65.     As alleged herein, Citigroup and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Citigroup, their control over and/or receipt and/or modification of Citigroup's allegedly materially misleading statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Citigroup, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

66.     During the Class Period, as detailed herein, defendants made false and misleading statements about Citigroup's business and prospects and engaged in a scheme to deceive the market.  This artificially inflated Citigroup's stock price and operated as a fraud or deceit on the Class.   Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Citigroup's stock price fell precipitously, as the prior artificial inflation

came out of the stock's price.  As a result of their purchases of Citigroup common stock during the Class period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

67.     The market for Citigroup common stock was open, well developed and efficient at all relevant times.  As a result of these materially false and misleading statements and omissions, as set forth above, Citigroup common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased Citigroup common stock relying upon the integrity of the market price of Citigroup common stock and market information relating to Citigroup, and have been damaged thereby.

68.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Citigroup common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

69.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Citigroup's business and prospects.  These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Citigroup and its business and prospects, thus causing the Company's common stock to be overvalued and its price to be artificially inflated at all relevant times.  Defendants'

- 33 -

materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market, the inflation in the price of Citigroup common stock was removed and the price of Citigroup common stock declined dramatically, causing losses to plaintiff and the other members of the Class.

## NO SAFE HARBOR

70.    Citigroup's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.   To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

71.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Citigroup who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE: FRAUD ON THE MARKET

72.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's common stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased Citigroup common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

73.     At all relevant times, the market for Citigroup common stock was efficient for the following reasons, among others:

(a)     Citigroup's shares met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

(b)     As a regulated issuer, Citigroup filed periodic public reports with the SEC;

(c)     Citigroup stock promptly moved in response to material information; and

(d)     Citigroup regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

74.     Based on the foregoing, the market for Citigroup common stock promptly digested current information regarding Citigroup from all publicly available sources and reflected such information in the prices of Citigroup shares, and plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

75.     In addition, plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of Citigroup common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their immediate families, the directors and officers of Citigroup, at all relevant times, and their immediate families, and defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

77.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Citigroup has more than two billion shares of common stock outstanding, owned by hundreds or thousands of persons.

78.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether the Exchange Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    whether the price of Citigroup common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

79.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

80.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

81.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

82.    Plaintiff incorporates ¶¶1-81 by reference.

83.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew, or recklessly disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

84.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Citigroup common stock during the Class Period.

85.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Citigroup common stock.  Plaintiff and the Class would not have purchased Citigroup common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

86.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Citigroup common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

87.    Plaintiff incorporates ¶¶1-86 by reference.

88.    The Individual Defendants acted as controlling persons of Citigroup within the meaning of §20 of the Exchange Act.  By virtue of their positions and their power to control public statements about Citigroup, the Individual Defendants had the power and ability to control the actions of Citigroup and its employees.  Citigroup controlled the Individual Defendants and

its other officers and employees.  By reason of such conduct, these defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding plaintiff and the members of the Class damages and interest;

C.      Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 13, 2020                ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         SAMUEL H. RUDMAN


                                         _____
                                               *s/ Samuel H. Rudman*
                                            SAMUEL H. RUDMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com

- 39 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
DANIEL J. PFEFFERBAUM
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

City of Sterling Heights General Employees' Retirement System ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|
| | *See* attached Schedule A. | | |

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*City of Sterling Heights General Employees' Retirement System v. Anheuser-Busch InBev SA/NV, No. 1:19-cv-05854 (S.D.N.Y.)*
*Gross v. Grupo Televisa, S.A.B., No. 1:18-cv-01979 (S.D.N.Y.)*

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _11 TH_ day of November, 2020.

City of Sterling Heights General Employees' Retirement System

By: _Richard A. Wiler_

Its: _CHAIRPERSON_

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 02/03/2016 | 864 | $38.56 |
| 08/10/2016 | 923 | $45.60 |
| 03/08/2017 | 345 | $62.39 |
| 04/19/2017 | 411 | $58.57 |
| 06/07/2017 | 223 | $61.28 |
| 08/02/2017 | 203 | $69.55 |
| 08/02/2017 | 228 | $69.40 |
| 08/02/2017 | 267 | $69.50 |
| 08/24/2017 | 170 | $67.73 |
| 10/18/2017 | 44 | $73.29 |
| 10/25/2017 | 271 | $73.72 |
| 11/29/2017 | 96 | $74.99 |
| 12/11/2017 | 39 | $75.90 |
| 12/18/2017 | 138 | $75.71 |
| 04/02/2018 | 190 | $66.82 |
| 05/07/2018 | 3,180 | $68.53 |
| 06/26/2018 | 310 | $66.21 |
| 06/29/2018 | 24 | $67.70 |
| 09/14/2018 | 399 | $70.64 |
| 01/25/2019 | 131 | $63.78 |
| 04/10/2019 | 236 | $65.25 |
| 08/23/2019 | 340 | $62.78 |
| 08/29/2019 | 262 | $63.55 |
| 10/12/2020 | 16 | $45.33 |

| Date<br>Sold | Amount of<br>Shares Sold | Price |
|---|---|---|
| 03/17/2016 | 124 | $42.84 |
| 05/20/2016 | 22 | $44.98 |
| 06/20/2016 | 59 | $42.91 |
| 10/21/2016 | 22 | $49.52 |
| 10/26/2016 | 476 | $49.82 |
| 11/18/2016 | 74 | $55.50 |
| 03/06/2017 | 181 | $60.34 |
| 03/16/2017 | 57 | $61.12 |
| 04/17/2017 | 7 | $58.80 |
| 05/31/2017 | 240 | $60.37 |
| 06/16/2017 | 58 | $63.80 |
| 07/21/2017 | 155 | $65.99 |
| 08/03/2017 | 153 | $68.65 |
| 08/18/2017 | 77 | $66.90 |
| 09/19/2017 | 304 | $71.45 |
| 09/25/2017 | 9 | $70.71 |
| 02/15/2018 | 123 | $76.80 |
| 03/07/2018 | 94 | $73.53 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 03/15/2018 | 79 | $73.25 |
| 04/12/2018 | 50 | $72.27 |
| 04/13/2018 | 10 | $70.42 |
| 05/04/2018 | 66 | $68.05 |
| 05/07/2018 | 145 | $68.47 |
| 05/16/2018 | 75 | $71.94 |
| 06/14/2018 | 202 | $66.37 |
| 07/18/2018 | 32 | $69.81 |
| 08/10/2018 | 177 | $70.26 |
| 08/13/2018 | 187 | $69.18 |
| 09/28/2018 | 131 | $72.23 |
| 10/10/2018 | 97 | $70.46 |
| 10/11/2018 | 59 | $69.13 |
| 10/22/2018 | 105 | $67.25 |
| 10/23/2018 | 316 | $64.75 |
| 11/09/2018 | 1,061 | $65.47 |
| 01/17/2019 | 145 | $62.28 |
| 03/20/2019 | 56 | $64.99 |
| 04/18/2019 | 179 | $70.03 |
| 07/17/2019 | 180 | $71.38 |
| 09/12/2019 | 135 | $69.64 |
| 12/18/2019 | 129 | $78.20 |
| 01/16/2020 | 48 | $81.16 |
| 02/27/2020 | 243 | $65.89 |
| 07/14/2020 | 162 | $50.35 |
| 08/18/2020 | 98 | $50.52 |
| 09/15/2020 | 2,093 | $44.85 |

Prices listed are rounded up to two decimal places.

*Opening position of 1,254 shares.